# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RANDALL HIRT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02:12-cv-1189 |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

April 12, 2013

**I.** **INTRODUCTION**

Randall Hirt ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 – 433 ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 10, 12). The record has been developed at the administrative level. For the following reasons, the decision of the ALJ will be vacated and the case REMANDED.

**II.** **PROCEDURAL HISTORY**

Plaintiff filed for DIB with the Social Security Administration on January 30, 2009, claiming a disability onset date of December 14, 2008. (R. at 101 – 02)[1]. Plaintiff's alleged inability to work resulted from limitations stemming from narcolepsy, cataplexy, obsessive compulsive disorder ("OCD"), attention deficit disorder ("ADD"), and anxiety. (R. at 115).

---

[1] Citations to ECF Nos. 8 – 8-15, the Record, *hereinafter*, "R. at __."

Plaintiff was initially denied benefits on April 3, 2009. (R. at 71 – 74). A hearing was held before an Administrative Law Judge ("ALJ") on July 15, 2010, at which Plaintiff, represented by counsel, testified, as did an impartial vocational expert. (R. at 25 – 44). The ALJ issued his decision denying benefits to Plaintiff on September 8, 2010. (R. at 7 – 24). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on June 21, 2012, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 4).

Plaintiff filed his Complaint in this Court on August 21, 2012. (ECF No. 3). Defendant filed an Answer on November 5, 2012. (ECF No. 7). Cross motions for summary judgment followed. The matter has been fully briefed. (ECF Nos. 11, 13).

### III. STATEMENT OF THE CASE

#### A. General Background

Plaintiff was born on December 11, 1979, was twenty-nine years of age at the time of his application for benefits, and was thirty years of age at the time of his administrative hearing. (R. at 111). Plaintiff had previously been granted a period of disability by the Social Security Administration between July 1, 2001 and September 1, 2002. (R. at 10). Since that time, Plaintiff worked a wide variety of jobs, the longest being a Sales Associate at a car dealership for approximately one-and-one-half years. (R. at 116, 126). Plaintiff cited frequent tardiness as the reason he lost most employment. (R. at 144). Plaintiff graduated from high school, and attended college for two years at Edinboro University of Pennsylvania. (R. at 123). He did not obtain a degree, and has no other post-secondary education or vocational training. (R. at 123).

At the time of his application for benefits, Plaintiff lived at home with his parents. (R. at 146). His hobbies included working on his car, playing video games, and volunteering once

every two weeks for an interfaith ministries group. (R. at 146, 150). Plaintiff had no issues with personal care. (R. at 147). Plaintiff rarely cooked, but was capable of helping with household repairs and some yard work. (R. at 148 – 49). Plaintiff had difficulty handling money and paying bills on-time. (R. at 149). However, he would shop for clothing, shoes, and car parts on the internet and occasionally in stores. (R. at 149). Plaintiff did not go out often, but was capable of traveling alone and could drive a car. (R. at 149). Plaintiff claimed that most daily tasks took a great deal of time for him to complete due to his impairments. (R. at 150).

**B. Treatment History**

Plaintiff received medication management for his mental impairments through psychiatrist Daniel Buysse, M.D. In November 2008, Dr. Buysse noted that Plaintiff was an hour late for his appointment, and that he had been experiencing difficulties with tardiness. (R. at 198). Plaintiff reported to Dr. Buysse that he believed that he was going to be terminated from his employment as a car salesman. (R. at 198). He stated that he had difficulty staying awake and had irregular sleep patterns. He reported difficulty in completing tasks in boring or repetitive situations. (R. at 189). Plaintiff claimed to feel "clouded" and had little structure in his life. (R. at 198). Plaintiff had not suffered a cataplexy-related episode in several months. (R. at 198). Dr. Buysse was unsure whether Plaintiff's behavior warranted a diagnosis of ADD in addition to his existing diagnosis of OCD. (R. at 199). His medication regimen was altered in an effort to alleviate Plaintiff's ongoing symptoms. (R. at 200).

Plaintiff began an intensive outpatient program at Western Psychiatric Institute and Clinic ("Western Psych") in March 2009 for treatment of his OCD. (R. at 203 – 04). At his initial assessment, he recalled experiencing OCD symptoms in 1995 – around the time when he was diagnosed with narcolepsy. (R. at 203 – 04). Plaintiff's OCD manifested itself in

3

"perfectionistic" behaviors, trouble with decision making, hoarding, fear of germs, and a need to "complete" things. (R. at 203 – 04). The ritualistic practices that resulted from Plaintiff's dysfunctional thinking interfered with daily functioning. (R. at 203 – 04). Plaintiff was observed to be anxious, mildly constricted in affect, disorganized in thought, and pressured in speech. (R. at 203 – 04). He frequently interrupted his clinician. (R. at 203 – 04). Insight and judgment were considered to be impaired. (R. at 203 – 04). Plaintiff was to engage in intensive therapy sessions, and would continue to be monitored by Dr. Buysse. (R. at 203 – 04).

Plaintiff's time in the intensive outpatient program lasted until May 29, 2009. (R. at 425 – 536). During that time he engaged in group and family therapy, as well as medication management with psychiatrists Robert Hudak, M.D., and Tae Park, M.D. (R. at 425 – 536). Plaintiff actively participated in group therapy, and completed increasingly challenging homework assignments to deal with his OCD symptoms. (R. at 425 – 536). His progress was slow, however. (R. at 425 – 536). While in therapy, Plaintiff was frequently found to be tardy and distracted, and he often over-explained and interrupted conversation. (R. at 425 – 536). Plaintiff's diagnoses included OCD, ADD, and narcolepsy. He made progress through treatment, and was noted by psychiatrists to be doing well, overall. (R. at 425 – 536). Plaintiff had attended therapy consistently. (R. at 419 – 23). Plaintiff progressed with respect to over-explaining, perfectionism, time management, and increased contribution to household chores. (R. at 419 – 23). Plaintiff left the program with good insight and judgment. (R. at 419 – 23).

Plaintiff was anxious about discharge from the intensive outpatient program, but agreed to continue to engage in group therapy and medication management. Plaintiff continued his treatment at Western Psych through January 2010. (R. at 391 – 424). Plaintiff was under the care of an outpatient therapist and Dr. Buysse. (R. at 421). Unfortunately, Plaintiff had

immediate difficulty maintaining his treatment gains once outside the intensive outpatient program. (R. at 391 – 424). He had frequent difficulty making his therapy sessions on-time. (R. at 391 – 424). He was occasionally disruptive; however, his affect was usually noted to be "bright." (R. at 391 – 424).

In 2009, Plaintiff had attempted to return to work, but was fired – although, not due to symptoms related to Plaintiff's impairments. (R. at 401, 404). Despite his termination, and in light of his initial denial of disability benefits, Plaintiff continued to look for employment. (R. at 403). Dr. Buysse believed this to be "appropriate." (R. at 403). Dr. Buysse noted that Plaintiff had lingering difficulty getting "stuck" on details during conversation. (R. at 394, 402). Yet, Dr. Buysse also found Plaintiff to be pleasant and cooperative, his mood was good, and his insight was good. (R. at 394, 402). Despite achieving some stability, Dr. Buysse opined that Plaintiff was "significantly impaired in a functional sense." (R. at 395). Re-entrance into the intensive outpatient program was being considered. (R. at 395).

Plaintiff again sought treatment through Western Psych's intensive outpatient program for his OCD. Plaintiff was admitted to the program on January 27, 2010, and was late for his intake appointment. (R. at 388 – 90). Plaintiff reported to the intake counselor that he was returning to the intensive outpatient program due to being in a "funk," despite continued participation in relapse prevention and medication management following the last intensive outpatient program. (R. at 388 – 90). Plaintiff described OCD behaviors and symptomology largely the same as experienced prior to the last intensive outpatient program. (R. at 388 – 90). Plaintiff's OCD allegedly made finding employment difficult, and had strained his relationship with his parents, upon whom he was dependent. (R. at 388 – 90).

5

Plaintiff's diagnoses were recorded to be OCD, ADD, and narcolepsy. (R. at 388 – 90). He was pleasant and made good eye contact, but had disorganized thoughts, rapid and pressured speech, and sad, mildly restricted affect. (R. at 388 – 90). He was still noted to struggle with perfectionism, compulsive "checking" behavior, poor time management, and difficulty with decision making. (R. at 388 – 90). As a part of his therapy, Plaintiff would be expected to increase social and outdoor activities, and would be expected to actively seek employment and/or volunteer opportunities. (R. at 388 – 90).

Plaintiff remained in the intensive outpatient program until April 2010. (R. at 265 – 387). He received medication from psychiatrist Abhishek Jain, M.D., who frequently noted that Plaintiff's concentration was poor due to ADD and OCD. (R. at 277, 300, 316, 331, 345, 359). During Plaintiff's second stint in the intensive outpatient program, his counselors frequently noted that he was tardy for group therapy and medication management, he was anxious, he engaged in over-explaining, he interrupted others, and he easily lost focus. (R. at 265 – 387). Plaintiff was motivated and actively participated, however. (R. at 265 – 387). He worked on numerous take-home assignments to expose himself to anxiety-inducing situations that triggered his OCD behaviors. (R. at 265 – 387). Plaintiff was to continue with therapy and medication management following his discharge from the intensive outpatient program. (R. at 265 – 387). He had experienced some improvement in symptoms. (R. at 265 – 387).

Subsequently, Plaintiff continued to struggle with the same behavioral issues outside of the intensive outpatient program, particularly with tardiness. (R. at 259 – 264). Plaintiff was treated by Karen Katunich, Ph.D. (R. at 259 – 264). She noted that Plaintiff was engaged in job training with Levin Clubhouse. (R. at 259 – 264). In an April 27, 2010 treatment note, Dr. Katunich indicated that Plaintiff was not emotionally ready for employment and could not

6

maintain a routine. (R. at 263). She stated that Plaintiff would need to demonstrate that he could consistently be on-time, and that he could approximate a full day of work at the Levin Clubhouse. (R. at 263).

**C. Functional Capacity Assessments**

State agency evaluator Dilip S. Kar, M.D., completed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff on March 26, 2009. (R. at 222 – 28). Based upon his review of the medical record, Dr. Kar believed that the evidence support the existence of severe impairment in the way of narcolepsy with cataplexy. (R. at 222 – 28). Plaintiff's only physical limitation, however, was environmental – Dr. Kar believed that he would need to avoid all exposure to workplace hazards such as machinery and heights. (R. at 222 – 28). Dr. Kar noted Plaintiff's long-standing diagnosis of narcolepsy with cataplexy, and aggressive pursuit of treatment. (R. at 222 – 28).

On March 31, 2009, state agency evaluator Richard A. Heil, Ph.D., completed a Mental RFC of Plaintiff. (R. at 229 – 31). Dr. Heil felt that the medical evidence of record supported a finding of impairment in the way of anxiety-related disorders. (R. at 229 – 31). As a result of said impairment, Dr. Heil indicated that Plaintiff would experience moderate limitation in maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, completing a normal work day and work week without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, making realistic goals, and planning independently of others. (R. at 229 – 31). Nonetheless, Plaintiff was believed to be capable of full-time work,

because Dr. Heil did not believe that Plaintiff's symptoms would last for twelve months. (R. at 229 – 31).

### D. Administrative Hearing

At his hearing, Plaintiff testified that his greatest impediment to maintaining full-time employment were the symptoms related to his OCD and narcolepsy. (R. at 29). Plaintiff explained that he had to fight the urge to sleep daily. (R. at 33). Boring and repetitive situations – such as sitting at a computer or doing paperwork – worsened Plaintiff's need for rest. (R. at 35). He typically had to take a nap during the day, as naps were the only relief for his sleepiness. (R. at 33). Plaintiff's need to wake up during the night to take prescribed medication contributed to poor sleep patterns and daytime fatigue. (R. at 32). Being physically active, as well as interested in an activity, would counteract sleepiness. (R. at 35). Plaintiff could drive, and driving a vehicle with a manual transmission helped Plaintiff fight sleepiness. (R. at 35). However, if Plaintiff felt sleepy before driving, he would take a nap before going out. (R. at 35). Informing past employers and co-workers about his narcolepsy earned Plaintiff ridicule and harassment. (R. at 33 - 34). Plaintiff had been able to take naps during his lunch hour. (R. at 34).

Plaintiff also described to the ALJ how his OCD limited his functionality. Plaintiff was frequently tardy as a result of overthinking related to a feeling that he was forgetting something before leaving his house. (R. at 37). Plaintiff would spend twenty to thirty minutes standing in place contemplating this issue. (R. at 37). Plaintiff's OCD also gave him difficulty with respect to organizational tasks. When presented with a situation requiring Plaintiff to put away items or clean, Plaintiff would be overwhelmed with thoughts regarding how best to complete the task.

As a result, Plaintiff would not accomplish his task, and simply accumulated things – such as 4,000 undeleted emails. (R. at 37, 39 – 40).

Plaintiff claimed that he had been attending the Levin Clubhouse for job coaching. (R. at 38). The organization was geared towards adults with special needs. (R. at 38). His job coaches helped to point out behavior that was not optimal in the workplace so that Plaintiff could change. (R. at 38). It was noted that Plaintiff had worked every year between 2004 and 2008, and that he had earned his highest salary in 2008 – $20,000.00. (R. at 29). Nonetheless, Plaintiff claimed that his mental conditions had deteriorated since his last full-time job in 2008, in spite of ongoing treatment to deal with dysfunctional behavior and prepare Plaintiff for the workforce. (R. at 41).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and job experience would be eligible for a significant number of jobs in existence in the national economy if limited to jobs involving no exposure to workplace hazards such as heights and dangerous machinery, only simple, repetitive tasks requiring no more than incidental change in work processes, no interaction with the public, and no interaction with co-workers. (R. at 42). The vocational expert replied that such a person would be capable of "assembly work," with 500,000 such positions available in the national economy, of "janitorial work," with one million positions available, and work as a "packer," with 250,000 positions available. (R. at 43). The ALJ then asked the vocational expert whether the hypothetical individual would be capable of sustaining a full-time job if absent from work approximately five times per month, and/ or tardy for work by – on average – one hour. (R. at 43). The vocational expert responded that such a person could not work full-time. (R. at 43).

## IV. STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[2], 1383(c)(3)[3]; *Schaudeck v.*

---

[2]  Section 405(g) provides in pertinent part:

*Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial

---

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

## V. DISCUSSION

In his decision, the ALJ concluded that Plaintiff suffered from severe medically determinable impairments in the way of narcolepsy with cataplexy, OCD, and ADD. (R. at 12). As a result of such impairments, the ALJ concluded that Plaintiff would experience non-exertional functional limitations relegating him to work not involving exposure to work place hazards such as unprotected heights and dangerous machinery, and requiring no more than simple, routine, repetitive tasks involving no more than incidental change of work processes or interaction with co-workers, and no interaction with the public. (R. at 14). Based upon the testimony of the vocational expert, the ALJ determined that even with such functional limitations, Plaintiff was qualified for a significant number of jobs in the national economy, and was not, therefore, disabled under the Act. (R. at 20 – 21).

Plaintiff objects to the determination of the ALJ, claiming that the ALJ erred in failing to accommodate all of the moderate limitations findings made by Dr. Heil in his Mental RFC, in failing to properly address Plaintiff's difficulties with tardiness, and in failing to give Plaintiff's subjective complaints of limitation full weight. (ECF No. 11 at 8 – 17). Defendant counters that the ALJ's decision was adequately supported by substantial evidence from the record. (ECF No. 13 at 8 – 11). The Court is inclined to agree with Plaintiff.

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F. 2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v.*

12

*Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706).

Further, an ALJ should accord subjective complaints similar treatment as objective medical reports, and weigh the evidence before him. *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 122 (3d Cir. 2000). Serious consideration must be given to subjective complaints where a medical condition could reasonably produce pain or limitation. *Mason v. Shalala*, 994 F. 2d 1058, 1067 – 68 (3d Cir. 1993). Moreover, there need not be objective evidence of a subjective complaint, and the ALJ must explain his rejection of same. *Id.* (quoting *Green v. Schweiker*, 749 F. 2d 1066, 1071 (3d Cir. 1984)); *Burnett*, 220 F. 3d at 122. When medical evidence provides objective support for subjective complaints of pain, the ALJ can only reject such a complaint by providing contrary objective medical evidence. *Mason*, 994 F. 2d at 1067 – 68. Even when an ALJ has personally observed a claimant, personal observations may not be the sole basis for rejecting subjective complaints of pain. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999) (citing S.S.R. 95-5p at 2 (1995)). However, while pain itself may be disabling, and subjective complaints of pain may support a disability determination, allegations of pain suffered must be consistent with the objective medical evidence on record. *Ferguson v. Schweiker*, 765 F. 2d 31, 37 (3d Cir. 1985); *Burnett*, 220 F. 3d at 122.

In light of the above, remand for reconsideration of this case is justified for a number of reasons. First, the ALJ failed to provide factual support from the record to demonstrate that Plaintiff was capable of maintaining punctuality in the workplace. Plaintiff's difficulties with

attendance and punctuality were noted consistently throughout the record by Plaintiff's treating sources. Plaintiff, himself, consistently explained that his difficulties with tardiness were the result of OCD behaviors that he had difficulty controlling – difficulties which were reflected in the medical record.

The ALJ attempted to counter the objective evidence and Plaintiff's subjective complaints with the simple statement that Plaintiff was able to make some group therapy appointments with "advanced planning." (R. at 18). The ALJ provided no support for this statement. The Court notes that, even with knowledge of the need for advanced planning to get to appointments on-time, Plaintiff's poor sleep and OCD-related symptoms frequently precluded him from following through. (R. at 262, 271, 308, 321, 325, 350, 353, 408, 409, 480, 491, 494, 497, 514, 526, 528). The record also showed that he was occasionally on-time without any indication of advanced planning. (R. at 274, 311, 342, 356, 415, 416, 436, 438, 456, 461, 488, 504, 535). Dr. Heil believed that Plaintiff would have at least moderate limitation with respect to performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances. (R. at 229 – 31). Dr. Katunich opined that Plaintiff could not maintain a routine. (R. at 263).

The ALJ points to no evidence demonstrating a pattern of advanced planning followed by consistent punctuality. The ALJ presented no evidence that Plaintiff was even capable of consistent advanced planning with the impairments with which he was diagnosed. Additionally, the ALJ failed to explain how intermittent punctuality with respect to therapy sessions approximated what would be required of a full-time job, eight hours per day, five days per week. As a result, Plaintiff's ability to maintain a sufficient degree of punctuality in order to be

employable was not adequately addressed by the ALJ in his decision, and must be revisited upon remand – looking both to the objective medical record and Plaintiff's subjective statements.

Based upon a review of the record, the Court is satisfied that the ALJ properly addressed the remainder of Dr. Heil's limitations findings, as well as Plaintiff's subjective complaints of limitation. However, the ALJ's RFC contained one notable discrepancy that was not adequately addressed in his decision. It was not contradicted in the record that Plaintiff would fall asleep while performing boring and *repetitive* work. Plaintiff testified to this fact, Dr. Buysse noted this fact in his findings, and the ALJ acknowledged this in his decision. (R. at 17). Yet, the ALJ inexplicably included in his hypothetical question and RFC that Plaintiff is "relegated to simple, routine, *repetitive* tasks." (R. at 14). To the extent that this may affect Plaintiff's employment prospects in the national economy, this limitation must be properly accommodated by the ALJ. If the ALJ felt inclusion of repetitive work was justified, he must provide some rationale.

## VI. CONCLUSION

Based upon the foregoing, substantial evidence was not adduced to support the ALJ's determination that Plaintiff was not disabled under the Act. Accordingly, Plaintiff's Motion for Summary Judgment will be granted to the extent remand for reconsideration is sought, and denied to the extent reversal and an immediate award of benefits is sought; Defendant's Motion for Summary Judgment will be denied; and, the decision of the ALJ will be vacated and the case remanded for further consideration consistent with this Memorandum Opinion.

"On remand, the ALJ shall fully develop the record and explain [his or her] findings… to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Comm'r of Soc. Sec.*, 625 F. 3d 798, 800 – 01 (3d Cir. 2010). *See also Ambrosini v. Astrue*, 727 F. Supp. 2d 414, 432 (W.D. Pa. 2010). Testimony

need not be taken, but the parties should be permitted input via submissions to the ALJ. *Id.* at 801 n. 2.

An appropriate order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RANDALL HIRT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02:12-cv-1189 |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER OF COURT

**AND NOW**, this 12th day of April, 2013, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1. Plaintiff's Motion for Summary Judgment (ECF No. 10) is **GRANTED** in part and **DENIED** in part.

2. Defendant's Motion for Summary Judgment (ECF No. 12) is **DENIED**.

3. This case is **REMANDED** to the Commissioner for further consideration and/or proceedings consistent with the foregoing Memorandum Opinion of the Court; and

4. The Clerk will docket this case closed forthwith.

BY THE COURT:

s/ Terrence F. McVerry
United States District Judge

cc: Kelie C. Schneider, Esq.
Email: kelieschneider@gmail.com

Cynthia C. Berger, Esq.
Email: cberger@bergerandgreen.com

Paul Kovac
Assistant U.S. Attorney
Email: paul.kovac@usdoj.gov